IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILLIAM WRODA,

       Plaintiff,

v.                                                                                                    CV 19-0289 JHR

ANDREW M. SAUL,[1]
Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

       This matter comes before the Court on Plaintiff William Wroda's Motion to Reverse or

Remand the Administrative Decision [Doc. 16], filed September 26, 2019. Pursuant to 28 U.S.C.

§ 636(c) and Federal Rule of Civil Procedure 73(b), the parties have consented to the undersigned

Magistrate Judge conducting dispositive proceedings in this case and entering final judgment.

[Docs. 5, 14, 15]. Having reviewed the parties' briefing, the relevant law, and the relevant portions

of the Administrative Record,[2] the Court **denies** Mr. Wroda's Motion and **affirms** the

Commissioner's final decision to deny him benefits under the Social Security Act.

## I.     INTRODUCTION

       This Court's institutional role in a social security appeal is specific and narrow. The Court

must affirm the final decision of the Commissioner where it is shown to be supported by substantial

evidence and is free from harmful legal error. Mr. Wroda argues that the administrative law judge

---

[1] Commissioner Andrew Saul was automatically substituted for former Acting Commissioner Nancy Berryhill as the Defendant in this action pursuant to Fed. R. Civ. P. 25(d) when he was sworn in as the Commissioner of Social Security on June 17, 2019.

[2] Documents 10-1 through 10-109 comprise the sealed Administrative Record ("*AR*"). The Court cites the Record's internal pagination rather than CM/ECF document and page number assigned when it was filed with the Clerk.

("ALJ") who denied him benefits failed to meet these deferential standards because he: (1) failed to adequately consider Mr. Wroda's foot impairment or the limitations to his hand usage at Step Two; (2) improperly determined that his cervical spine impairment did not meet Listing § 1.04; (3) improperly determined that his mental impairments did not meet Listing § 12.15; and (4) erred in formulating his RFC and in relying on the vocational expert's ("VE's") testimony. [*See generally* Doc. 17]. However, having carefully reviewed the Commissioner's decision, the Court finds that the ALJ: (1) did not make any reversible error at Step Two; (2) properly determined that Mr. Wroda's cervical spine impairment did not meet Listing § 1.04; (3) properly determined that Mr. Wroda's mental impairments did not meet Listing § 12.15; and (4) properly assessed Mr. Wroda's RFC and relied upon the VE's testimony. The Court further finds that the ALJ's findings were supported by substantial evidence. Therefore, because Mr. Wroda has failed to demonstrate that the ALJ committed a reversible legal error or that his findings were unsupported by substantial evidence, the Commissioner's final decision to deny Mr. Wroda benefits under the Act must be affirmed.

## II.   **PROCEDURAL HISTORY**

Mr. Wroda applied for both disability insurance benefits under Title II of the Social Security Act and supplemental security income benefits under Title XVI of the Act on February 18, 2016. *AR* at 396-97, 401-02. In support of his applications, Mr. Wroda initially alleged a disability onset date of January 1, 2009, due to bipolar disorder, cervical stress, cervical stenosis, radiculopathy, hallux rigidus, and ganglia index finger. *AR* at 147, 454. He later amended his onset date to September 25, 2015. *AR* at 51, 553. The Administration denied Mr. Wroda's claims initially and upon reconsideration, and he requested a *de novo* hearing before an ALJ. *AR* at 147-206, 246.

ALJ Michael Leppala held two separate administrative hearings on Mr. Wroda's disability claim, one on August 10, 2017, and one on September 25, 2018. After the first hearing, the ALJ issued an unfavorable decision, but the Appeals Council remanded Mr. Wroda's claim for re-evaluation of his mental impairments and RFC. *See AR* at 15, 232-33. Following a second hearing, the ALJ once again issued an unfavorable decision on December 21, 2018. *AR* at 15-34. Mr. Wroda, aided by his present counsel, requested review of the ALJ's decision by the Appeals Council, but on March 21, 2019, the Council denied his request. *AR* at 1. As such, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

Mr. Wroda filed a timely Complaint appealing that decision and invoking this Court's jurisdiction under 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210(a) on March 29, 2019. [*See* Doc. 1]. The parties consented to the undersigned Magistrate Judge presiding over this case [Docs. 5, 14, 15], and briefing was completed on February 3, 2020. [Doc. 23].

## III.    THE COMMISSIONER'S FINAL DECISION

A claimant seeking social security benefits under the Act must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(l)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[3]

---

[3] The Tenth Circuit summarized these steps in *Allman v. Colvin,* 813 F.3d 1326, 1333 n.l (10th Cir. 2016):

> At step one, the ALJ must determine whether a claimant presently is engaged in a substantially gainful activity. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). If not, the ALJ then decides

At Step One of the sequential evaluation process, the ALJ found that Mr. Wroda had not engaged in substantial gainful activity since his amended alleged onset date. *AR* at 21. At Step Two, he determined that Mr. Wroda had the following severe impairments: "chronic degenerative disc disease with stenosis and affective disorders." *AR* at 21. The ALJ explained that he evaluated Mr. Wroda's bipolar disorder, post-traumatic stress disorder ("PTSD"), and depression under the umbrella of affective disorders. *AR* at 21 n.1. Pertinent to Mr. Wroda's appeal, the ALJ also determined that Mr. Wroda's bilateral foot pain was nonsevere. *AR* at 21-22. In reaching this conclusion, the ALJ noted repeated observations in Mr. Wroda's treatment records of a normal gait as well as Mr. Wroda's own reports of well-controlled pain and walking for exercise. *AR* at 22-23.

At Step Three, the ALJ concluded that Mr. Wroda's impairments do not meet or medically equal the regulatory "listings." *AR* at 23-25. When a claimant does not meet a listed impairment at Step Three the ALJ must determine the extent to which he remains able to work before proceeding to identify jobs he is capable of performing at Steps Four and Five. This assessment of the claimant's remaining ability is referred to as his residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). "RFC is not the least an individual can do despite his or her limitations or restrictions, but the most." SSR 96-8p, 1996 WL 374184, at *1. In this case, the ALJ determined that Mr. Wroda retains the RFC to:

> [p]erform light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.967(b) except [he] can lift and/or carry twenty pounds occasionally and ten pounds frequently. [He] can stand and/or walk for about six hours and sit for about six

---

whether the claimant has a medically severe impairment at step two. *Id.* If so, at step three, the ALJ determines whether the impairment is "equivalent to a condition 'listed in the appendix of the relevant disability regulations.'" *Id.* (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). Absent a match in the listings, the ALJ must decide at step four whether the claimant's impairment prevents [her] from performing [her] past relevant work. *Id.* Even if so, the ALJ must determine at step five whether the claimant has the RFC to "perform other work in the national economy." *Id.*

hours in an eight-hour workday, all with normal breaks. [He] can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs, but never climb ladders, ropes, or scaffolds. [He] must avoid all exposure to hazards. [He] can understand, carry out, and remember simple instructions and make commensurate work related decisions. [He] can respond appropriately to coworkers, supervision, and work situations. [He] can deal with routine changes in the work setting. [He] can maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout the workday. [He] is limited to simple, routine, and repetitive tasks, and is best suited [to] working with things, not people.

*AR* at 25.

Employing this RFC at Step Four, and relying on Mr. Wroda's work history, his testimony, and the testimony of the VE, the ALJ determined that Mr. Wroda was unable to perform his past relevant work as a data entry clerk, public health educator, bookkeeper, or community organization worker. *AR* at 32. Nevertheless, the ALJ found, at Step Five, that "there are jobs that exist in significant numbers in the national economy that [Mr. Wroda] can perform." *AR* at 33. Specifically, he determined that Mr. Wroda can perform the jobs of price marker and housekeeping cleaner, both unskilled jobs at the light exertional level. *AR* at 34. Consequently, the ALJ determined that Mr. Wroda was not under a disability as defined in the Social Security Act from September 25, 2015, through the date of the decision. *AR* at 34.

## IV.   <u>LEGAL STANDARDS</u>

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). "[I]n making this determination, [this Court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016) (citation omitted). The Court must exercise "common sense" when determining whether the substantial evidence standard has been met; if the Court can follow the

ALJ's reasoning, the decision must stand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The standard for a decision to be supported by substantial evidence is low. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d l080, l084 (10th Cir. 2007) (citation omitted).

## V.   <u>ANALYSIS</u>

Mr. Wroda argues that the ALJ failed to adequately consider his limitations in standing, walking, and hand usage and failed to adequately account for his limitations in maintaining concentration, persistence, and pace and in interacting with coworkers and supervisors. However, as explained below, the Court finds that the ALJ's decision is free from legal error and supported by substantial evidence. As such, the Court will deny Mr. Wroda's motion to remand.

### A. The ALJ committed no reversible error at Step Two of the sequential evaluation process.

At Step Two, a claimant bears the burden to demonstrate an impairment or combination of impairments that significantly limits his physical or mental ability to do basic work activities. *See Williamson v. Barnhart*, 350 F.3d 1097, 1099 (10th Cir. 2003); 20 C.F.R. §§ 404.1520, 416.920(c). The impairment identified by the claimant must be "the *cause* of the claimant's failure to obtain substantial gainful work." *Samford v. Berryhill*, No. 18cv0176 JHR, 2019 WL 1261967, at *3 (D.N.M. Mar. 19, 2019) (citing *Williamson*, 350 F.3d at 1100). "An impairment is 'severe' if it 'significantly limits [a claimant's] physical or mental ability to do basic work activities." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (quoting 20 C.F.R. §404.1520(c)).

Here, the Commissioner insists that the ALJ adequately considered Mr. Wroda's foot impairment at Step Two, offering a detailed discussion of the records related to his foot surgeries

and treatment but noting that Mr. Wroda had progressed well and exhibited a normal gait. [Doc. 21, pp. 10-13]. The Court agrees that the ALJ adequately considered Mr. Wroda's bilateral foot impairments and surgeries. *See AR* at 21-22.

The ALJ noted that Mr. Wroda sought treatment for bilateral foot pain in November 2015 but that he retained a non-antalgic gait. *AR* at 21 (citing *AR* at 709). He observed that imaging showed "mild osteoarthritis in the right foot" and that the only recommended treatment was a change of foot wear. *AR* at 22 (citing *AR* at 712). He also emphasized that Mr. Wroda reported "walking for exercise" in January 2016. *AR* at 22 (citing *AR* at 794).

The ALJ noted that following a bilateral first joint metatarsophalangeal joint cheilectomy, Mr. Wroda was progressing well with well-controlled pain. *AR* at 22 (citing *AR* at 916). The ALJ explained that in March 2016, Mr. Wroda reported walking for exercise six times per week and in April 2016, his records revealed a normal gait and the ability to walk on heels and toes without complication. *AR* at 22 (citing *AR* at 937, 942). Likewise, he found that additional records suggested that Mr. Wroda had a normal gait and the ability to walk on heels and toes without complication between July and November 2016. *AR* at 22 (citing *AR* at 1012, 1022, 1031, 1043, 1401, 1411). Acknowledging that Mr. Wroda sought treatment for foot pain in October 2016, the ALJ observed that he claimed to be without pain in December 2016 following surgery on his right foot. *AR* at 22 (citing *AR* at 1858, 1864).

Next, the ALJ noted that Mr. Wroda had bilateral fusions in May 2017. *AR* at 22. While Mr. Wroda reported continued pain in June 2017, the ALJ emphasized that his treatment provider attributed the pain "to some degree" to ongoing recovery from surgery. *AR* at 22 (citing *AR* at 1886). At that same time, the ALJ observed that separate treatment notes reported a normal gait. *AR* at 22 (citing *AR* at 1648). According to the ALJ, July 2017 x-rays of Mr. Wroda's feet showed

"stable alignment and postoperative appearance, without significant interval callus development." *AR* at 22 (citing *AR* at 1617). Next, the ALJ explained that August 2017 treatment notes revealed that Mr. Wroda was able to walk five blocks with limitations attributed to back pain, rather than foot impairments, and that he, again, demonstrated a normal gait. *AR* at 22 (citing *AR* at 1919, 1921). Although Mr. Wroda had another foot surgery in August 2017 to remove hardware from a previous surgery, the ALJ found that he demonstrated normal range of motion in his left foot the next month. *AR* at 22 (citing *AR* at 1990). The ALJ summarized Mr. Wroda's six-week check-up, which showed "excellent stability, no pain with palpitation, and mild to moderate swelling" in the right foot and "tenderness to palpitation at the first joint, with only mild swelling" in the left foot. *AR* at 22 (citing *AR* at 2050). He also noted Mr. Wroda's reports of no pain despite Mr. Wroda's failure to follow instructions to remain non-weight bearing. *AR* at 22 (citing *AR* at 2055). The ALJ considered that Mr. Wroda underwent left foot surgery in October 2017 and that records from November 2017 indicated a left foot fracture; however, he explained that Mr. Wroda exhibited a normal gait and that his December 2017 bone density test was normal. *AR* at 22 (citing *AR* at 2060, 2076, 2120). According to the ALJ's review of the records, Mr. Wroda was treated with medication to address recurrent stress fractures in late 2017 and a bunionectomy and removal of hardware in early 2018. *AR* at 22 (citing *AR* at 2120, 2200). Finally, the ALJ reported that merely two weeks after surgery, Mr. Wroda's pain was "reasonably controlled." *AR* at 22 (citing *AR* at 2214).

In short, the ALJ considered and discussed Mr. Wroda's bilateral foot impairments and treatment in considerable detail, emphasizing that Mr. Wroda "was repeatedly observed to ambulate with a normal gait, even soon after corrective surgeries." *AR* at 22-23. He also observed that Mr. Wroda's recovery from foot surgeries took under a year. *AR* at 22-23. For these reasons,

he concluded that Mr. Wroda's foot pain was a nonsevere impairment. *AR* at 23. This finding and analysis were thorough and supported by substantial evidence.

In contrast to the ALJ's discussion of Mr. Wroda's foot impairments, however, he neglected to discuss limitations in Mr. Wroda's hand usage at Step Two. Mr. Wroda submits that the ALJ "entirely failed to acknowledge limitations in hand usage . . . , which [were] documented by evidence indicating numbness and motor weakness in the right upper extremity with dropping of objects and difficulty with grasping . . . , and multiple findings of numbness in the right, dominant[] hand." [Doc. 17, p. 11 (citing *AR* at 1008-14, 1026-33, 1037-45)]. But the Commissioner maintains that so long as Mr. Wroda had at least one severe impairment, the ALJ was required to proceed to the remainder of the sequential evaluation process, taking all medically determinable impairments into account. [Doc. 21, pp. 10-11].

The Court agrees that an ALJ need only find one severe impairment to proceed beyond Step Two. *Allman*, 813 F.3d at 1330. The Tenth Circuit has explained that the "reason is grounded in the Commissioner's regulation [at 20 C.F.R. § 404.1520(a)(4)(ii)] describing step two, which states: 'If you do not have a *severe* medically determinable physical or mental impairment . . . or combination of impairments that is severe . . . , we will find that you are not disabled.'" *Id*. at 1330. Thus, so long as an ALJ finds a severe impairment, he may not deny benefits at Step Two but must proceed to the next step. *Id*.

To the extent Mr. Wroda argues that the ALJ erred in not finding either his foot or hand impairments severe at Step Two, any such error was harmless. The Tenth Circuit has clarified that "the failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe." *Id.* Significantly, here, the ALJ found two other severe impairments at Step Two. *See AR* at 21.

Still, Mr. Wroda maintains that the ALJ's failure to consider all severe impairments at Step Two resulted in error at Step Five, as he contends the ALJ's RFC failed to account for his foot and hand impairments. [Doc. 17, p. 11]. Indeed, an ALJ must consider all impairments, including those found to be non-severe, when assessing an RFC. 20 C.F.R. §§ 404.1545(a)(2), 404.1521(a). Despite the ALJ's determination that Mr. Wroda's foot impairment was not severe at Step Two, he at least purported to consider Mr. Wroda's "reported foot impairment with respect to the [RFC], including with respect to the inclusion of postural and environmental limitations." *See AR* at 23. He also acknowledged Mr. Wroda's complaints of hand symptoms in the context of his RFC Assessment. *See AR* at 26. Having determined that the ALJ committed no reversible error at Step Two, the Court considers in Sections V(D) whether the ALJ gave adequate consideration to Mr. Wroda's foot and hand usage impairments in accordance with his RFC determination.

**B. The ALJ did not err in concluding that Mr. Wroda's cervical spine impairment failed to meet Listing § 1.04, and his determination is supported by substantial evidence.**

Listing §1.04(A) provides:

*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A). Because there is no alleged involvement of the lower back here, Mr. Wroda must show a compromise of the nerve root or spinal cord with the presence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. *See id.* Mr. Wroda maintains that, in

fulfillment of Listing §1.04(A), the record shows cervical spinal stenosis with nerve root encroachment, neuro-anatomic distribution of pain, decreased range of motion in the cervical spine, motor weakness and numbness in the right upper extremity, sensory/reflex loss (i.e. right hand numbness and paresthesias in the C8 distribution), and a positive Spurling's test. [Doc. 17, pp. 12-13]. The Commissioner counters, insisting that the record does not reflect motor loss accompanied by sensory or reflex loss. [Doc. 21, p. 15].

The ALJ concluded that the "record does not indicate that the listing requirements [of 1.04] are satisfied." *AR* at 23. He acknowledged that the record revealed "occasional positive Spurling's test" but reasoned that Mr. Wroda's cervical spine impairment did not meet Listing § 1.04, because his "strength continued to measure at 5/5 and during some examinations, [he] retained a normal range of motion" and "repeated EMG tests . . . were negative." *AR* at 23 (citing *AR* at 714, 1001, 1753, 1764, 1940, 2108). Ultimately, having determined that Mr. Wroda's cervical spine condition did not meet the relevant listing, the ALJ clarified that he considered the impairment as part of his RFC analysis. *AR* at 23.

The records the ALJ relied upon reveal that on October 9, 2015, Dr. Robert S. Wallach determined that Mr. Wroda had cervical spine stenosis, right cervical radiculopathy, and severe right foraminal stenosis at C5-C6. *AR* at 714. At the same time, Dr. Wallach also noted a "normal EMG of the right upper extremity on September 25, 2015." *AR* at 714. Dr. Wallach opined that Mr. Wroda's "EMG excluded a more peripheral process or nerve damage." *AR* at 715. At a March 7, 2017 examination by Gregory J. Maroney, P.A., Mr. Wroda was assessed with cervical spondylosis without myelopathy, Spurling's signs that worsened with left lateral bend, and tenderness, pain, and spasm in his lumber back. *AR* at 1764. His motor examination revealed "[s]trength 5/5 throughout," normal range of motion, and negative radiculopathy. *AR* at 1764. Mr.

Maroney explained that he found more cervical degenerative disc disease than radiculopathy, although he acknowledged that "Dr. Ray . . . was able to find radic[ulopathy]." *AR* at 1764-65. While Mr. Wroda had a positive Spurling's test on March 27, 2017, with pain going down the arm suggesting radiculopathy, pain in the neck and down to the shoulder suggesting facet arthropathy, and pain in the muscles on either side of the neck suggesting myofascial etiology, he also demonstrated normal range of motion in his neck. *AR* at 1001, 1753. An April 1, 2017 cervical MRI showed "similar to slightly worsened degenerative changes of [the] cervical spine. At C5-6, there was mod[erate] to severe right and moderate left neural foraminal narrowing." *AR* at 1941. Yet, there were "no levels of severe spinal canal stenosis." *AR* at 1941. In an August 17, 2017 examination of Mr. Wroda's neck, Mr. Wroda showed a normal range of motion, no spinous process tenderness, and no muscular tenderness. *AR* at 1940. He did, however, have a positive Spurling's test and was again assessed with cervical spondylosis. *AR* at 1940. The findings from Mr. Wroda's December 18, 2017 exam were nearly identical to those from August 17, 2017. *Compare AR* at 2108-09, *with AR* at 1941. The ALJ provided a thorough discussion of medical records as they related to Mr. Wroda's cervical spine impairment, albeit largely in the context of his RFC analysis. *See AR* at 26-28. He also explained that "in consideration of [Mr. Wroda's] reduced cervical range of motion," he included environmental limitations in the RFC. *AR* at 29 (citing *AR* at 1010, 1753).

The Commissioner emphasizes that no medical expert opined that Mr. Wroda met Listing § 1.04, and he argues that a state agency reviewer, Eileen M. Brady, M.D., opined that he did not. [Doc. 21, p. 15 (citing the January 10, 2017 opinion of Dr. Brady at *AR* at 187-90)]. Although Dr. Brady did not, as the Commissioner implies, explicitly opine that Mr. Wroda failed to meet Listing § 1.04, she did explain that "[b]ased upon review of all available evidence, the initial RFC is

affirmed." *AR* at 187-88. She noted that the initial RFC "proposed that [Mr. Wroda] retained the capacity for light level work." *AR* at 187. Logically, if Mr. Wroda retained the capacity for light work, he necessarily failed to meet Listing § 1.04. And, for his part, Mr. Wroda points to no opinion from any medical source that he met Listing § 1.04.

The Commissioner submits that substantial evidence supports the ALJ's findings with respect to Listing § 1.04 because Mr. Wroda generally had normal strength, normal EMG findings, and normal range of motion, except in his neck. [Doc. 21, p. 15]. He argues that the presence of "scattered abnormalities – among a host of normal findings – falls short of satisfying all the requirements of Listing § 1.04(A)." [Doc. 21, pp. 15-16]; *see also* 20 C.F.R. pt. 404, Subpt P., App. 1, § 100(D) (the presence of abnormal findings over a period of time "must be established by a record of ongoing management and evaluation."). Mr. Wroda, though, characterizes the Commissioner's argument as "incongruous," explaining that it is precisely Mr. Wroda's cervical neck impairment – which the Commissioner suggests showed a decreased range of movement – that was at issue in the ALJ's § 1.04 analysis. Yet, the Court's review of Mr. Wroda's records reveals that he *did* at times demonstrate normal range of motion in his neck. *See*, *e.g*., *AR* at 1001, 1940. Likewise, there is support in the record for the ALJ's findings that Mr. Wroda had normal strength and normal EMG findings. *See*, *e.g*., *AR* at 714-15, 1764-65. In sum, substantial evidence supports the ALJ's finding concerning Listing § 1.04.

Mr. Wroda suggests that the ALJ's analysis was inadequate for another reason: because the ALJ asserted that "the remainder of listing section 1.04" was not satisfied "as discussed below" but then neglected to follow up with a discussion of the remainder of the listing's requirements. [Doc. 17, p. 13]. Contrary to Mr. Wroda's position, however, the Court is satisfied with the ALJ's discussion of the details of Mr. Wroda's medical treatment for his cervical spine impairment.

13

The ALJ explained, for example, that "an EMG study of [Mr. Wroda's] right upper extremity in September 2015 was normal." *AR* at 26 (citing *AR* at 714). He noted that an MRI of Mr. Wroda's cervical spine from October 2015 showed "moderate to severe right foraminal stenosis with encroachment on the right C6 nerve root and mild stenosis of the right lateral recess, central canal, and left neural foramen at C5-6 and moderate right foraminal stenosis with mild left foraminal stenosis at C4-5." *AR* at 26-27 (citing *AR* at 713). Additionally, he emphasized that in April 2017 Mr. Wroda showed similar to worsened degenerative changes of the cervical spine and that at C5-6, there was "moderate to severe right and moderate left neural foraminal narrowing and no levels of severe spinal canal stenosis." *AR* at 27 (citing *AR* at 1506).

Given that the medical records reveal findings of normal range of motion in Mr. Wroda's neck, normal strength, and normal EMG findings, the Court finds that the ALJ's Step-Three determination – that Mr. Wroda's cervical spine impairment did not meet or equal Listing § 1.04 – is supported by substantial evidence.

**C.  The ALJ did not err in determining that Mr. Wroda's mental impairments failed to meet Listing § 12.15 or in his consideration of the opinions of Ms. Duncan, and substantial evidence supports his Step-Three analysis of Mr. Wroda's mental impairments.**

The ALJ considered whether Mr. Wroda's mental impairment met or medically equaled Listings §§ 12.04, 12.06, or 12.15. *AR* at 23-25. Mr. Wroda contends that the ALJ erred when he determined that Mr. Wroda's mental impairments did not meet Listing § 12.15.

The ALJ evaluated Mr. Wroda's mental impairments under the revised "paragraph B" criteria for Listing § 12.15. *AR* at 23-25. These criteria consider a claimant's ability to (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. § 404.1520a(c)(3); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E). To satisfy Listing § 12.15, a claimant must be "extremely"

limited in at least one area, or "markedly" limited in at least two areas. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00(F), 12.15(B).

The ALJ determined that Mr. Wroda had a moderate limitation in his abilities to understand, remember, or apply information, interact with others, and maintain concentration, persistence, or pace. *AR* at 24. He also found that Mr. Wroda had a mild limitation in adapting or managing himself. *AR* at 24. In support, he cited evidence from Mr. Wroda's Function Reports, treatment records, and testimony. *AR* at 24 (citing *AR* at 335, 433, 435-38, 499, 503, 888, 942, 2003). Because Mr. Wroda's mental impairment did not cause at least two "marked" limitations or one "extreme" limitation, the ALJ determined that the paragraph B criteria were not satisfied. *AR* at 24. Likewise, the ALJ found that Mr. Wroda failed to meet the "paragraph C" criteria, as he found no evidence of "repeated and extended episodes of decompensation, . . . a likelihood of decompensation in response to changes in mental demands or environment, or . . . an inability to function outside of a highly supporting environment." *AR* at 24-25.

Mr. Wroda insists that in reaching these conclusions the ALJ failed to properly consider the opinions of his treating therapist, Mary Duncan, L.C.S.W., and instead, superimposed his own findings over those of Ms. Duncan. [Doc. 17, pp. 14-16]. Mr. Wroda highlights two questionnaires from Ms. Duncan in which she opined that his symptoms would fulfill the criteria under § 12.15. [Doc. 17, pp. 14-16 (citing *AR* at 1508-13, 2282-87)]. In Ms. Duncan's most recent questionnaire, dated May 7, 2018, she found Mr. Wroda "extreme[ly]" or "marked[ly]" impaired in each category of the "paragraph B" criteria. *AR* at 2285. Mr. Wroda acknowledges that Ms. Duncan's earlier questionnaire reports were less severe than her later questionnaire reports, but he explains that Ms. Duncan began treating him only a short time before she completed the earlier questionnaire. [Doc. 17, p. 15].

Although the ALJ did not explicitly discuss Ms. Duncan's opinions in the context of his Step-Three findings, he did discuss those opinions in detail in his RFC assessment. *AR* at 31. In his RFC assessment, the ALJ specified that he gave the opinions of Ms. Duncan "little weight," reasoning that they were "not supported by the record." *AR* at 31. He explained that comparing the date of Ms. Duncan's report with her treatment notes suggested that her "opinion was not based upon an examination of [Mr. Wroda]." AR at 31 (citing AR at 2356). Further, he criticized her opinions as inconsistent with her own treatment notes, which suggested that Mr. Wroda's symptoms were stable and even improving "through the use of therapy modalities including cognitive behavioral therapy." *AR* at 31 (citing *AR* at 1514-39, 2355-91).

Notably, an ALJ's findings at other steps of the sequential evaluation process may provide a proper basis for upholding the ALJ's Step-Three conclusions. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Here, the Court finds that the ALJ supplied legitimate reasons for discounting Ms. Duncan's opinions, and he did so in a manner sufficient to allow subsequent reviewers to follow his reasoning. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (the ALJ considers an opinion's consistency with the record as a whole); *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.") (quoting *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2) (the ALJ's discussion of non-acceptable medical source opinions should be sufficient for subsequent reviewers to "follow the adjudicator's reasoning").

Moreover, there is substantial evidence supporting the ALJ's findings as to Listing § 12.15. As the ALJ observed, the record reveals that Mr. Wroda enjoyed adult coloring books, reading, cooking, watching TV, playing games, and spending time online. *AR* at 437, 499, 942. He reported

spending time shopping one or two times per week, doing housework, and managing his finances. *AR* at 435-36, 501. He indicated that he socialized with neighbors and his mother (*AR* at 503), and his treatment records revealed that he sometimes spent the weekend around "tons of kids and people" or entertained company (*AR* at 888, 2003). Finally, in Mr. Wroda's own assessment, he can follow written instructions "fairly well" and follow verbal instructions "better than written ones." *AR* at 438. In contrast, the record also demonstrates that Mr. Wroda complained of "extreme problems concentrating/ remembering," the ability to read for only 10 or 15 minutes, and difficulty interacting with others socially or being amongst crowds. *See*, *e.g.*, *AR* at 433, 437, 503. Nevertheless, taken together, the evidence supports the ALJ's finding of moderate limitations in Mr. Wroda's ability to understand, remember, or apply information, in his ability to interact with others, and in his ability to exercise concentration, persistence, and pace. The Court is satisfied that the ALJ's Step-Three determination as to Listing § 12.15 is supported by substantial evidence.

**D. The ALJ did not err in assessing Mr. Wroda's RFC or in relying on the VE's testimony, and substantial evidence supports his RFC.**

> **i. The ALJ's hypothetical adequately incorporated the limitations in Mr. Wroda's RFC and the ALJ did not err in relying on the VE's testimony.**

According to Mr. Wroda, if the ALJ had properly considered his hand and foot impairments, he would have restricted him to sedentary work at most. [Doc. 17, p. 25]. Instead, the ALJ limited Mr. Wroda to light work with some additional restrictions. *AR* at 25. He specified that Mr. Wroda "can walk off-and-on for no more than about six hours during an eight-hour workday, and stand off-and-on for no more than about six hours during an eight-hour workday, and can stand or walk off-and-on for a total of about six hours during an eight-hour workday." *AR* at 25. Mr. Wroda insists that the latter findings (i.e. that Mr. Wroda can stand "off-and-on" for no more than six hours), which he refers to as the ALJ's "ultimate findings," were inconsistent with

the hypothetical the ALJ raised for the VE as well as with the jobs propounded by the ALJ. [Doc. 17, p. 20]. The Commissioner maintains, on the other hand, that the ALJ's explanation of Mr. Wroda's ability to stand or walk off-and-on did not add any additional limitation to those imposed by a restriction to light work. [Doc. 21, p. 19]. To this end, he explains that SSR 83-10 defines light work as standing or walking, off and on, for a total of six hours in an eight-hour workday. *Id.* Mr. Wroda responds: "We are not arguing it is inconsistent with the [SSR] definition [of light work]. We are arguing it is inconsistent with the hypothetical question given to the vocational expert." [Doc. 22, p. 6]. He maintains that the ALJ did not include the requirement that the hypothetical claimant be able to stand or walk for six hours off-and-on throughout the workday. [Doc. 22, pp. 6-7].

Social Security Ruling 83-10 provides: "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work . . . ." 1983 WL 31251, at *5-6. Additionally, SSR 83-1- provides that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, on and off, for a total of approximately 6 hours in an 8-hour workday. Sitting may occur intermittently during the remaining time." *Id.* at *6. In other words, "the *full range* of light work is usually described as work requiring the ability to sit, and stand and/or walk about six hours each in an eight-hour workday." *Reed v. Astrue*, No. 09-1395 JWL, 2011 WL 578740, at *3-*4 (D. Kan. Feb. 9, 2011) (citing 20 C.F.R. §§ 404.1567, 416.967; SSR 83-10, 1983 WL 31251, at *5-*6).

18

To be sure, light work contemplates some degree of alternating between standing and walking, given that it requires standing or walking "on and off" for six hours. However, this requirement is distinguishable from one in which a claimant must be permitted to alternate between sitting and standing at a particular interval. *See id.* at *4-5 (reasoning that the requirement that a claimant alternate between sitting and standing every thirty minutes was an additional limitation, rendering the claimant able to perform only "a range of light work" rather than "the full range of light work").

Here, the ALJ asked the VE to assume that a "hypothetical individual the claimant's age and education [was] capable of occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying ten pounds. Standing and/or walking for about six hours in an eight hour workday and sitting for about six hours in an eight hour workday all with normal breaks." *AR* at 73. The VE responded by identifying jobs – price marker and housekeeping cleaner – both of which were categorized as light, unskilled jobs. *AR* at 74. Mr. Wroda argues that the ALJ's omission of the "off and on" distinction for standing and/or walking "is significant as none of the jobs cited by ALJ Leppala . . . could be performed by an individual who is limited to such standing or walking." [Doc. 17, p. 20]. The Commissioner counters that the hypothetical question included all RFC limitations reasonably identified by the ALJ and provided substantial evidence supporting the ALJ's decision. [Doc. 21, p. 19]. The Court agrees with Commissioner that the ALJ's hypothetical adequately incorporated the limitations in Mr. Wroda's RFC and that the ALJ did not err in relying on the VE's testimony. In short, the ALJ determined that Mr. Wroda can perform the sitting, standing, and walking requirements of light work, and he had no obligation to further limit his hypothetical to specify the "on and off" nature of these functions.

### ii.  The ALJ properly considered the opinions of Dr. Edmonds, and his findings were supported by substantial evidence.

19

Mr. Wroda submits that the ALJ erred in finding that he can perform light work, where Jeremy T. Edmonds, D.O. determined that he can sit or stand for only one hour, Mr. Wroda himself testified that he can only stand for ten minutes, he had been issued a handicap placard, and he had undergone many foot surgeries. [Doc. 17, pp. 19-20]. In short, Mr. Wroda claims substantial evidence does not support the ALJ's light work finding.

Dr. Edmonds opined in a February 6, 2017 letter that Mr. Wroda's foot impairment and cervical disc disease would "affect his ability to be regularly and gainfully employed." *AR* at 1495. According to Dr. Edmonds, Mr. Wroda's recent foot surgery precluded him from being "weight-bearing for likely the next 6 to 8 weeks," and his "chronic degenerative cervical disc disease with stenosis" rendered him "unable to sit or stand for more than one hour at a time, . . . [to] do any lifting above his head of greater than 10 pounds[, or to] . . . lift any more than 25 pounds below his waist." *AR* at 1495. Dr. Edmonds explained that Mr. Wroda's cervical disc disease was unresponsive to "accepted therapies" and was expected to "remain stable or possibly worsen." *AR* at 1495.

The ALJ acknowledged Dr. Edmond's February 6, 2017 letter, detailing his opinions. *AR* at 30 (citing *AR* at 1495). The ALJ offered the following four reasons for giving Dr. Edmonds' opinions "little weight": (1) "the finding of disability is one reserved to the Commissioner" (*AR* at 30 (citing 20 C.F.R. §§ 404.1527, 416.927)); (2) the "opinion appears to be related to [Mr. Wroda's] recent foot surgery, which [Dr. Edmonds] opined limit[ed him] for six to eight weeks" (*AR* at 30); (3) the opinions "are inconsistent with the conservative course of treatment of [Mr. Wroda's] degenerative disc disease of the cervical spine" (*AR* at 30 (citing *AR* at 930, 936, 1001, 1017, 1624, 1688, 1755, 1936, 2133, 2271)); and (4) the opinions are "inconsistent with repeated

observations of [Mr. Wroda's] 5/5 strength in the upper extremities" (*AR* at 30 (citing 1753, 1764, 1940, 2041, 2108, 2179)).

Beginning with Mr. Wroda's lifting limitations, the Commissioner emphasizes that Dr. Edmonds found that Mr. Wroda can lift and carry 25 pounds below the waist, where light work requires lifting only 20 pounds or less. [Doc. 21, p. 20 (citing 20 C.F.R. § 404.1567(b), which provides that light work involves lifting no more than 20 pounds at a time and 10 pounds frequently)]. Mr. Wroda clarifies, however, that it is not his position that he is precluded from light work based upon lifting limitations but, instead, because of limitations on his ability to stand and walk; specifically, he maintains that there is no basis for a finding that he could stand and/or walk up to six hours in an eight-hour day. [Doc. 22, pp. 7-8]. Thus, the Court focuses its inquiry on whether the ALJ offered a legitimate reason for rejecting Dr. Edmonds' opinion that Mr. Wroda can only sit or stand for one hour at a time.

The full range of light work does require the ability to stand or walk, off and on, for a total of approximately six hours in an eight-hour day. SSR 83-10, 1983 WL 31251, at *6. As noted above, the ALJ did not include any requirement that Mr. Wroda be permitted to alternate between sitting or standing at a particular interval. Without any such limitations, the RFC cannot be considered consistent with Dr. Edmonds' opinion.

The Commissioner maintains that "the ALJ reasonably discounted Dr. Edmonds'[] opinion because it appeared to relate to short-term limitations resulting from Plaintiff's recent foot surgery." [Doc. 21, p. 20 (citing *AR* at 30)]. The Court agrees that the short-term nature of Mr. Wroda's weight-bearing restrictions following foot surgery was a legitimate reason for the ALJ to discount any limitations resulting from that surgery. After all, an impairment must be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 414.909. Significantly,

though, Dr. Edmonds attributed Mr. Wroda's inability to stand for more than one hour to his cervical disc disease, not to his foot surgery or impairment. *See AR* at 1495 ("Because of his neck pain, he is unable to sit or stand for more than one hour at a time."). Thus, the Court considers whether Mr. Wroda's relatively conservative treatment for cervical degenerative disc disease was a legitimate reason for rejecting Dr. Edmonds' opinion as to Mr. Wroda's ability to sit and stand. The question is not whether the Court disagrees with the weight the ALJ gave Dr. Edmonds' opinions but, instead, whether his rationale was supported by law and substantial evidence; if it is, the Court may not reweigh the opinion or substitute its judgment for the ALJ's. *See Sanchez v. Saul*, No. CV 18-1214 JHR, 2020 WL 1236607, at *4 (D.N.M. Mar. 13, 2020).

The Court finds that the ALJ's determination as to the sitting and standing limitation is supported by law, as an ALJ must consider whether an opinion has support in and is consistent with the record. *See* 20 C.F.R. § 404.1527(c)(3)-(4). Specifically, the ALJ's rejection of Dr. Edmonds' standing limitation is supported by the ALJ's reference to various treatment records, including: an April 11, 2016 record from David Gary Ray, M.D., explaining that Mr. Wroda is not "a surgical candidate," is "best managed in the pain clinic," and that his neck pain is best treated "with injections and/or physical therapy" (*AR* at 936); an April 25, 2016 record from Dr. Ray describing an injection of Decadron and lidocaine in the right C3-4 through C5-6 facet joints (*AR* at 930); a May 10, 2016 record from Eliezer R. Pangan, N.P., noting that he discussed cervical medical branch block trials for treating Mr. Wroda's neuropathic pain (*AR* at 1001); an August 10, 2016 record from Dr. Ray explaining that he performed a cervical right radiofrequency ablation ("RFA") on July 20, 2016, with "75% of [Mr. Wroda's] pain . . . relieved x 2 weeks" and later "a > 50 % reduction in his pain" and with "all of his right arm radiculopathy . . . resolved after the RFA" (*AR* at 1017); a March 27, 2017 record from Vivienne Susan Prinz, C.N.P., reporting that

Mr. Wroda "is starting PT again," "[a]dd[ing] occupational therapy and acupuncture therapy," and will receive a cervical epidural "if MRI is showing the need" (*AR* at 1755); a May 12, 2017 record from Dr. Edmonds, indicating that for treatment of cervical radiculopathy, Mr. Wroda should "continue indomethacin, Cymbalta, [and] Lyrica" and "add baclofen to help reduce muscle spasm" and that he should "continue physical therapy and exercises" (*AR* at 1688); a July 24, 2017 record from Dr. Ray explaining that he performed a "C7-T1 Cervical Epidural Steroid Injection with sedation" to treat Mr. Wroda's cervical radiculopathy (*AR* at 1624); an August 17, 2017 record from Ms. Prinz, explaining that Mr. Wroda "has tried acetaminophen, heat, ice, muscle relaxants and NSAIDs . . . as well as epidural and ablations," and these treatments "provided mild relief" (*AR* at 1936); and January 8, 2018 and April 11, 2018 records from Dr. Edmonds reporting that he treated Mr. Wroda's neck pain and thoracic pain with trigger point injections without anesthesia or sedation (*AR* at 2133, 2271).

These records, which suggest that Mr. Wroda's neck pain was treated primarily with injections, physical therapy, and medication, provide substantial evidence for the ALJ's finding that Mr. Wroda was offered relatively conservative treatment for his cervical degenerative disc disease. It was reasonable for the ALJ to consider such treatment to be at odds with Dr. Edmonds' opinion that his neck impairment rendered him "unable to sit or stand for more than one hour at a time." In short, the ALJ offered specific, legitimate reasons for discounting Dr. Edmonds' opinion concerning Mr. Wroda's ability to sit and stand. *See Ringgold v. Colvin*, 644 F. App'x 841, 843 (10th Cir. 2016). As long as the ALJ employs regulatory factors and supports his reasoning with substantial evidence, his decision to effectively reject an opinion must be affirmed. *See Sanchez*, 2020 WL 1236607, at *5.

As for Mr. Wroda's testimony that he was limited in walking and standing and his medical records documenting multiple foot surgeries, the ALJ reasonably noted that Mr. Wroda repeatedly demonstrated a normal gait. *See AR* at 22-23 (citing *AR* at 1921, 2076). As noted above, the ALJ emphasized that Mr. Wroda "was repeatedly observed to ambulate with a normal gait, even soon after corrective surgeries." *AR* at 23. Moreover, the ALJ *did* include postural and environment limitations to account for some difficulties attributable to Mr. Wroda's cervical spine impairment and/or foot impairments. *See AR* at 25. Substantial evidence supports the ALJ's findings concerning Mr. Wroda's ability to stand, walk, and sit, and the Court will not reweigh the evidence.

### iii.  The ALJ did not err in failing to include manipulative limitations in the RFC.

Next, Mr. Wroda argues that the ALJ's RFC failed to consider or incorporate limitations in hand usage, which he maintains were caused by his cervical spine impairment and carpal tunnel syndrome. [Doc. 17, p. 21]. Mr. Wroda highlights his own testimony from his first hearing that he can only use his right hand for approximately five minutes and from his second hearing that he had lost feeling in his right hand. [Doc. 17, p. 21 (citing *AR* at 110, 132)]. In contrast, the Commissioner insists that the ALJ did acknowledge that Mr. Wroda's complaints of hand symptoms. [Doc. 21, p. 21].

The Court agrees that the ALJ did not gloss over Mr. Wroda's purported hand symptoms. Rather, he acknowledged that Mr. Wroda reported that impairments in his ability to "use his hands" in his December 2016 Function Report. *AR* at 26 (citing *AR* at 504). Even so, the ALJ omitted any manipulative limitations from Mr. Wroda's RFC. *See AR* at 25. Consistent with the requirements of light work, the ALJ determined that Mr. Wroda can "lift, carry, push or pull no more than 20 pounds at a time and frequently lift, carry, push or pull objects weighting up to 10 pounds." *AR* at 25.

24

In support of his RFC determination, the ALJ emphasized that the EMG results for Mr. Wroda's right upper extremity were normal. *See*, *e.g.*, *AR* at 26-27 (citing *AR* at 714, 1764). He specifically recounted that "an EMG study of [Mr. Wroda's] right upper extremity in September 2015 was normal." *AR* at 26 (citing *AR* at 714). He also referenced a separate record, from March 6, 2017, which indicated that radiculopathy was "NEG TODAY" and that Gregory J. Maroney, P.A. found Mr. Wroda's neck pain to be "more cervical [degenerative disc disease] than radiculopathy" and only "mild CTS to the rt wrist." *AR* at 27 (citing *AR* at 1764).

Although not specifically referenced by the ALJ, additional records expand on Mr. Wroda's negative EMG results. An October 9, 2015 record from Dr. Wallach explained that Mr. Wroda's "EMG excluded a more peripheral process or nerve damage." *AR* at 715. And a June 12, 2017 record from Baljinder Sandhu, M.D., indicated that Mr. Wroda's "NCV/EMG of [his right upper extremity was] normal with [n]o sign of carpal tunnel syndrome or ulnar neuropathy. . . [and n]o acute or chronic denervation seen." *AR* at 1666.

On the other hand, the ALJ did specifically note that Mr. Wroda repeatedly demonstrated normal (5/5) strength in his upper extremities. *AR* at 30 (citing *AR* at 1753, 1764, 1940, 2041, 2108, 2179). He also expressly afforded "great weight" to the opinions of Mark A. Werner, M.D. and Eileen M. Brady, M.D., state agency medical doctors, whose RFCs also omitted manipulative limitations. *AR* at 29; *see also AR* at 156, 171 (Dr. Werner opining that Mr. Wroda has no manipulative limitations and specifying that Mr. Wroda had an "[u]nlimited" ability to push and or pull, including operation of hand controls); *AR* at 188, 202 (Dr. Brady affirming Dr. Werner's initial RFC at the reconsideration level). The ALJ credited the opinions of Drs. Brady and Warner as "being based upon a review of the record, being well explained, and in consideration of their experience with Social Security Administration disability standards." *AR* at 29. Not only did he

credit these opinions, he "generally adopted" them for his own RFC, though he imposed additional environmental limitations to account for Mr. Wroda's reduced cervical range of motion. *See AR* at 29 (citing *AR* at 1010, 1753). The ALJ indicated that he considered objections made by Mr. Wroda's representative concerning the opinions of Drs. Werner and Brady, but he concluded that the doctors' opinions were "well supported and consistent with the evidence." *See AR* at 29.

The Court agrees that Dr. Werner's opinion, and by extension Dr. Brady's opinion, were based upon a thorough review of the record, well-explained, and supported by the record. Like the ALJ, Dr. Werner emphasized that Mr. Wroda's records showed normal EMGs. *AR* at 172. He referenced a record from September 2015 that revealed "no evidence of right median, ulnar or superficial radial neuropathy, plexopathy, or cervical radiculopathy." *AR* at 172. He noted that a February 23, 2016 examination of Mr. Wroda's right hand revealed normal range of motion, intact sensation, and intact FDS and FDP muscles. *AR* at 172. The ALJ also explained that, following hand surgery for removal of a ganglion cyst, Mr. Wroda retained motor strength of 5/5 for his fourth and fifth digits and "sensory was intact." *AR* at 172. Dr. Werner observed that a May 2016 examination did not mention problems with Mr. Wroda's right hand. *AR* at 173. Finally, while Dr. Werner acknowledged that Mr. Wroda reported pain going down his arm, he observed that Mr. Wroda "has no problems with personal care, cooks, [and] helps with housework." *AR* at 173.

The Court is satisfied that the ALJ provided legitimate reasons for affording great weight to the opinions of Drs. Werner and Brady and for largely adopting their RFCs, which omitted manipulative limitations. The Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014). And, as the Commissioner points out, Mr. Wroda has pointed to no contrary opinion suggesting that hand limitations were necessary. [Doc. 21, p. 21].

Mr. Wroda also takes aim at the VE's testimony concerning hand usage. Specifically, he suggests that the ALJ erred by accepting the VE's propounded jobs, which require frequent hand usage, and by failing to address adverse VE testimony in response to a hypothetical raised by Mr. Wroda's attorney. [Doc. 17, p. 25; Doc. 22, p. 8]. Mr. Wroda emphasizes that the VE testified that a restriction to occasional reaching, handling, fingering, and feeling with the right dominant hand would eliminate all jobs. [Doc. 17, pp. 21-22 (citing *AR* at 76-77); Doc. 22, pp. 8]. He maintains that he cannot perform the jobs propounded by the VE, because they require frequent handling and one requires frequent fine manipulation. [Doc. 17, p. 24]. For instance, he insists that he cannot perform the job of marker, because he has numbness and weakness in his dominant hand and can only write for five minutes at a time, or the job of housekeeper, as he requires the assistance of home health care for similar functions in his own home. [Doc. 17, p. 24].

In response to questioning from Mr. Wroda's representative at the administrative hearing, the VE testified that if a claimant was restricted to only occasionally reaching, handling, fingering, feeling with the right dominant hand, it would eliminate the jobs propounded, "and there would not be any jobs that would fall within that addition." *AR* at 77. But, simply, Mr. Wroda was not so restricted. The ALJ's RFC did not include manipulative restrictions, and the ALJ was not required to adopt the VE's answer to Mr. Wroda's representative's hypothetical question, as the question included limitations not accepted by the ALJ. *See Sanchez*, 2020 WL 1236607, at *9. In short, where the ALJ omitted manipulative limitations in his RFC, he was under no duty to compare such limitations with the requirements of the jobs identified by the VE. *See id*. The Court finds no error with respect to the ALJ's reliance on the testimony of the VE here.

### iv. The ALJ did not err in failing to incorporate an inability to attend and concentrate for two hours at a time in Mr. Wroda's RFC.

Next, Mr. Wroda contends that the ALJ erred in failing to incorporate an inability to attend and concentrate for two hours at a time in his RFC. [Doc. 17, pp. 22-23]. The ALJ assessed a mental RFC that limited Mr. Wroda to understanding, carrying out, and remembering simple instructions and making commensurate work-related decisions. *AR* at 25. He found that Mr. Wroda is able to respond appropriately to coworkers, supervisors, and work situations and that he can deal with changes in routine. *AR* at 25. But most relevant to Mr. Wroda's assertion, he determined that Mr. Wroda can maintain concentration, persistence, and pace for two hours at a time. *AR* at 25. At the same time, he explained that Mr. Wroda is limited to simple, routine, and repetitive tasks and is best suited to working with things, rather than people. *AR* at 25, 30.

The ALJ acknowledged Mr. Wroda's complaints that he had difficulties with concentration and memory. *See AR* at 26 (citing *AR* at 433 (Mr. Wroda "endorsed difficulties with concentration and memory"); 438 (Mr. Wroda "attest[ed] that his impairments affected his abilities to . . . concentrate, remember, and complete tasks"); 504 (Mr. Wroda alleged, in a December 2016 Function Report, that his impairments affected his abilities to . . . remember, complete tasks, concentrate, understand, and follow instructions" and "elaborated that he . . . did not pay attention for long or finish what he started"). Yet he determined that Mr. Wroda's statements concerning intensity, persistence, and the limiting effects of symptoms were not entirely consistent with medical evidence. *AR* at 26.

Mr. Wroda submits that "there is no basis for ALJ Leppala's finding that [he] could maintain attention and concentration for two hours at a time." [Doc. 17, p. 22]. He emphasizes that Ms. Duncan found a marked impairment in this area of functioning and that the ALJ himself found a moderate impairment in this area at Step Three. [Doc. 17, p. 22 (citing AR at 24, 2285-87)]. The Commissioner argues that there were conflicting opinions regarding limitations in concentration,

persistence, and pace – where agency reviewers concluded Mr. Wroda is able to attend and concentrate for two hours – but Ms. Duncan opined that he had marked or extreme limitations in concentration, persistence, and pace. [Doc. 21, p. 22]. He submits that the ALJ reasonably resolved this conflict [Doc. 21, pp. 2], and the Court agrees.

Following a review of Mr. Wroda's records, state agency physician Scott R. Walker, M.D. opined that Mr. Wroda can "attend and concentrate for two hours at a time." *AR* at 154, 169. He acknowledged that Mr. Wroda had reported problems with memory and concentration but noted that his "recent exams were normal." *AR* at 154, 169. Indeed, according to Dr. Walker, Mr. Wroda's subjective complaints were "not fully consistent with the longitudinal professional observations." *AR* at 154, 169. Dr. Walker explained that "[l]ongitudinal evidence show[ed] that [Mr. Wroda's] mental impairments [were] present but stabilized with psychotropics." *AR* at 154, 169. Dr. Walker also opined that Mr. Wroda can "understand, remember and carry out detailed but not complex instructions, make decisions, . . . interact adequately with coworkers and supervisors and respond appropriately to changes in a work setting." *AR* at 154, 169. In support of these findings, Dr. Walker referenced multiple records reporting normal mood and affect as well as records finding his "attention and memory were grossly intact." *See AR* at 153-54, 168-69. Renate Wewerka, Ph.D. explained on reconsideration that Mr. Wroda's "updated medical evidence did not reveal any significant changes to his mental status" and that she would affirm Dr. Walker's mental RFC. *AR* at 189, 203.

The ALJ specified that he gave the opinions of Drs. Walker and Wewerka "great weight." *AR* at 30 (citing *AR* at 154, 169, 189, 203). He found these opinions to be "based upon a review of the record, . . . well explained, and [based on] their experience with Social Security Administration disability standards." *AR* at 30 (citing *AR* at 154, 169, 189, 203). He specifically noted that these

doctors considered "repeated observations of [Mr. Wroda's] normal or appropriate mood and affect." *AR* at 30 (citing *AR* at 833, 947, 1001, 1349, 1530, 1922). Further, he reasoned that the opinions were "consistent with the medication and behavioral therapy-based treatment of [Mr. Wroda's] impairments." *AR* at 30 (citing *AR* at 943, 1005, 1012, 1032, 1043, 1263, 1270, 1356, 1395, 1513, 1688, 1757, 2102). Nevertheless, "in consideration of the objection of [Mr. Wroda's] representative to the finding that [Mr. Wroda] could perform skilled work," the ALJ adopted a "more restrictive" RFC. *AR* at 30 (citing *AR* at 321). That is, he limited Mr. Wroda to unskilled work, where Drs. Walker and Wewerka had found him capable of understanding, remembering, and carrying out detailed instructions. The ALJ further found that Mr. Wroda was more suited to working with things than people.[4]

The ALJ acknowledged that, in contrast to the opinions of Drs. Walker and Wewerka, Ms. Duncan, Mr. Wroda's treating therapist, found him markedly limited in his ability to concentrate, persist, or maintain pace. *AR* at 30. Despite Ms. Duncan's relationship with Mr. Wroda, the ALJ gave her May 4, 2017 opinion only "some weight," describing it as "internally inconsistent." *AR* at 30. The ALJ observed inconsistencies in Ms. Duncan's social interaction limitations, where she found mild limitations in one instance but marked limitations in another. *AR* at 30 (citing *AR* at 1510-12). He indicated that he also found her opinions "inconsistent with her treatment notes [from] the same day." *AR* at 30-31 (citing *AR* at 1519). The ALJ's critique of Ms. Duncan's May 4, 2017 social interaction findings was fair. *Compare AR* at 1511 (finding only a mild limitations in Mr. Wroda's ability to interact with others), *with AR* at 1513 (finding moderate limitations in

---

[4] Technically, the ALJ stated that "based on [Mr. Wroda's] reported difficulties getting along with others," he was "best suited [to] working with people, rather than things." *AR* at 30. However, given the context of this finding, which is premised upon Mr. Wroda's reported difficulties in getting along with others, it is clear that the ALJ intended to find that Mr. Wroda was best suited to working with things, rather than people. Indeed, when he first articulated this limitation, he indicated that Mr. Wroda was "best suited [to] working with things, not people." *AR* at 25. The Court is satisfied that his later finding included a typographical error.

some areas of social interaction and marked limitations in others, including the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers without distracting them). Moreover, the Court agrees that Ms. Duncan's May 4, 2017 opinion was in fact inconsistent with her treatment notes, including treatment notes from the same day she rendered her opinion. *See*, *e.g.*, *AR* at 1519 (reporting on May 4, 2017, that Mr. Wroda's mood, affect, participation, thought process, speech, and perception were "appropriate," his insight was "good," and he had made "some progress").

The ALJ also evaluated a subsequent questionnaire from Ms. Duncan. *AR* at 30-31. In her May 7, 2018 opinion, Ms. Duncan opined that Mr. Wroda was "markedly or extremely limited" in all function domains. *AR* at 31 (citing *AR* at 2285-87). The ALJ gave this later opinion "little weight," determining that it was "not supported by the record." *AR* at 31. According to the ALJ, the opinion was "inconsistent with [Ms. Duncan's] treatment notes, which detail general[] stability or some improvement of [Mr. Wroda's] symptoms through the use of therapy modalities including cognitive behavior therapy." *AR* at 31 (citing *AR* at 1514-39, 2355-91). Having compared Ms. Duncan's May 7, 2018 opinion with her treatment notes, the Court finds the ALJ's rationale for rejecting this opinion equally reasonable.[5] *Compare AR* at 2285-87, *with AR* at 1514-39, 2355-91). In sum, the ALJ's treatment of the opinions of Drs. Walker and Wewerka, which he credited, and of Ms. Duncan, which he discounted, was appropriate and supported by substantial evidence.

---

[5] Although the Court finds the ALJ's rationale for rejecting Ms. Duncan's opinions generally reasonable, it does disagree with the ALJ in one regard. The ALJ suggested that Mr. Wroda rescheduled his appointment on May 7, 2018, and was therefore not examined, on the same day that Ms. Duncan issued her opinion. But the Court's review of the record shows that Mr. Wroda was in fact examined by Ms. Duncan on May 7, 2018 (*AR* at 2357) and that it was, instead, May 10, 2018, when Mr. Wroda rescheduled his appointment due to surgery (*AR* at 2356). Ultimately, this misunderstanding is of little consequence, as Ms. Duncan's opinions are inconsistent in other ways described by the ALJ.

Indeed, the ALJ reasonably resolved the conflicting opinions as to Mr. Wroda's abilities with respect to concentration, persistence, and pace.

But even if the ALJ properly weighed the medical opinions, Mr. Wroda maintains that the ALJ nevertheless erred by failing to incorporate into the RFC his own moderate impairment in the area of concentration, persistence, and pace. [Doc. 17, p. 22]. In response, the Commissioner submits that the ALJ adequately took into account moderate limitations in concentration, persistence, and pace by limiting Mr. Wroda to unskilled work. [Doc. 21, p. 23 (citing *Vigil*, 805 F.3d at 1204; *Bales v. Colvin*, 576 F. App'x 792, 798 (10th Cir. 2014))].

Unskilled work requires: (1) understanding, remembering, and carrying out simple instructions; (2) making judgments commensurate with unskilled work (simple); (3) responding appropriately to supervision, coworkers, and usual work situations; and (4) dealing with changes in a routine work setting. SSR 96-9p, 1996 WL 374185, at *2 (July 2, 1996). In his RFC assessment, the ALJ found that Mr. Wroda can perform each of these requirements. Beyond this, he found that Mr. Wroda was limited to simple, routine, and repetitive tasks but that he is able to "maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks through the workday." *AR* at 25. Earlier, however, at Step Three, he found a moderate limitation in concentration, persistence, and pace. *AR* at 24.

As here, the ALJs in both *Vigil* and *Bales* found moderate limitations of concentration, persistence, and pace at Step Three; then, in their RFC assessments, they limited the claimants to unskilled work. *Vigil*, 805 F.3d at 1203; *Bales*, 576 F. App'x at 797. In both cases, the Tenth Circuit explained that "a moderate limitation in concentration, persistence, or pace at step three does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment." *Vigil*, 805 F.3d at 1203; *Bales*, 576 F. App'x at 798. In *Vigil*, the court noted that, at

the "'more detailed' step four assessment of Vigil's RFC, . . . the ALJ found evidence that Vigil had some problems with concentration, persistence, and pace 'such that he could not be expected to perform complex tasks.'" *Vigil*, 805 F.3d at 1203. However, the ALJ reasoned that Vigil retained sufficient memory and concentration to perform at least simple tasks. *Id*. at 1203-04. As such, he accounted for Vigil's moderate problems in concentration, persistence, and pace by limiting him to unskilled work. *Id*. at 1204. Despite this finding, the court acknowledged that "there may be cases in which an ALJ's limitation to 'unskilled' work does not adequately address a claimant's mental limitations." *Id*.

Mr. Wroda suggests that this is one such case. In fact, he suggests that *Vigil* and *Bales* have been superseded by *Carr v. S.S.A.*, 734 F. App'x 606 (10th Cir. 2018) and *Parker v. S.S.A.*, 772 F. App'x 613 (10th Cir. 2019). In *Carr*, the ALJ found that the claimant had moderate difficulties with concentration, persistence, and pace, specifying that she had "problems with concentration and memory after her brain surgery." 734 F. App'x at 610 (citation omitted). Nevertheless, the ALJ determined that the claimant retained an RFC for "light work subject to certain non-exertional limitations . . . ." *Id*. at 608. Specifically, he found that

> [a]lthough [her] short-term memory and pace are slowed, she retains the ability to understand, remember and carry out simple and some more complex tasks under routine supervision. [She] can relate to others on a superficial work basis and to a lesser degree with the general public. [She] can adapt to a work situation.

*Id*. (quotation omitted). The Tenth Circuit noted that the ALJ had included certain deficits in memory and pace in the RFC assessment that he excluded from the hypothetical question to the VE. *Id.* The hypothetical question to the VE only addressed a claimant with the ability to understand, remember, and carry out simple tasks under routine supervision. *Id*. at 610. The court reversed the lower court's decision on the basis that the ALJ failed to accurately describe the claimant's mental limitations in his hypothetical questions to the VE. *Id*. at 608. And Mr. Wroda

argues the ALJ's hypothetical here likewise failed to incorporate his finding that Mr. Wroda had moderate limitation in concentration and instead suggested he had no impairment in concentration. [Doc. 17, pp. 22-23].

But this case is distinguishable from *Carr*. While the RFC assessments in this case and in *Carr* both found the claimants capable of understanding, remembering and carrying out simple instructions, only the ALJ in *Carr* specified a slowed short-term memory and pace. The Tenth Circuit in *Carr* reasoned that the ALJ failed to articulate an accurate hypothetical question to a VE, because a limitation to unskilled or simple work generally did not capture all of the claimant's mental limitations. In short, it failed to account for the claimant's slowed short-term memory and pace. Without an equivalent finding in Mr. Wroda's RFC assessment, the Court cannot say that the ALJ's hypothetical to the VE was inadequate. Notably, the court in *Carr* reaffirmed its conclusion in *Vigil*, explaining that an ALJ may restrict a claimant to unskilled work to account for moderate mental limitations when formulating an RFC. *Id*. at 610-11.

Similarly, in *Parker*, 772 F. App'x 613 (10th Cir. 2019), the court again reaffirmed *Vigil*, acknowledging that an ALJ "can sometimes account for mental limitations by limiting the claimant to particular kinds of work." *Id*. at 616 (citing *Vigil*, 805 F.3d at 1203-04). Nevertheless, the court concluded that the ALJ there "failed to incorporate the pertinent parts of . . . two medical opinions." *Id*. at 615. But the omitted opinions there involved claimant's abilities to accept supervision, to interact with coworkers, and to respond to work situations and routine changes. *Id*. at 616. They did not relate to limitations in the claimant's concentration, persistence, or pace.

The Court is satisfied that, rather than overruling *Vigil* in *Carr* and *Parker*, the Tenth Circuit reaffirmed its holding. Moreover, neither *Carr* nor *Parker* supports the conclusion that Mr.

Wroda's RFC failed to account for all of his mental limitations. The Court will not reverse on this ground.

### v. The ALJ did not err in failing to incorporate an inability to interact appropriately with coworkers and supervisors in the RFC.

Finally, Mr. Wroda insists that the ALJ should have adopted an RFC limitation to address his inability to interact appropriately with coworkers and supervisors. [Doc. 17, p. 23]. In support, he notes that Ms. Duncan found marked impairments in his ability to accept instruction, to respond appropriately to criticism from supervisors, and to work with others without distracting them or being distracted by them. [Doc. 17, p. 23 (citing *AR* at 1512-13)]. He suggests these findings are consistent with his own testimony that he had difficulties with male authority figures. [Doc. 17, p. 23 (citing *AR* at 61, 68-69)].

As determined above, the ALJ reasonably discounted Ms. Duncan's opinions. In so doing, he specifically noted Ms. Duncan's purportedly inconsistent treatment of Mr. Wroda's social interaction limitations, noting that she found mild limitations in one instance but marked limitations in another. *AR* at 30 (citing *AR* at 1510-13); *compare AR* at 1511 (mild limitations in interacting with others), *with AR* at 1513 (marked limitations in various categories of social interaction). Further, as the Commissioner points out, the ALJ acknowledged Mr. Wroda's testimony that he had difficulty with male authority figures, [Doc. 21, pp. 23-24; *AR* at 26], but he also noted Mr. Wroda's testimony that he can adequately deal with people on a limited basis. [Doc. 21, pp. 23-24; *AR* at 26]. The ALJ discounted Mr. Wroda's testimony as to his psychiatric symptoms, observing numerous activities that would undermine significant limitations in social functioning. *AR* at 26. For instance, the ALJ observed that Mr. Wroda worked at election polls, was considering part-time work for a friend who owned a shop, traveled out of state to Pagosa

Springs, and was excited about an upcoming vacation. *AR* at 32 (citing *AR* at 952, 1350, 1599, 2391).

Earlier, in his Step-Three analysis, where he determined that Mr. Wroda had moderate limitations in interacting with others, the ALJ acknowledged Mr. Wroda's reports of difficulty getting along with others and strained relationships with family members, but he highlighted records suggesting that Mr. Wroda's complaints were overstated. *AR* at 24. For instance, he referenced records demonstrating that Mr. Wroda spent at least one weekend around "tons of kids and people," shopped in stores once or twice per week, talked with neighbors, had telephone calls with his mother, and was unable to participate in a physical therapy session on one occasion because he was occupied with company. *AR* at 24 (citing *AR* at 436, 438, 503, 888, 2003). Ultimately, the ALJ concluded that Mr. Wroda's allegations as to social limitations were "not entirely consistent with the evidence." *AR* at 32. Nevertheless, he incorporated an RFC limitation that Mr. Wroda was best suited to working with things, rather than people. *AR* at 25. The Court finds the ALJ's analysis adequate and his RFC and findings supported by substantial evidence.

**VI.   ORDER**

Mr. Wroda has failed to convince this Court that the Commissioner's final decision to deny his Social Security benefits under Titles II and XVI of the Act was tainted by legal error or unsupported by substantial evidence. Wherefore, **IT IS THEREFORE ORDERED** that Plaintiff William Wroda's Motion to Reverse or Remand the Administrative Decision [Doc. 16], is **DENIED** and the decision of the Commissioner is **AFFIRMED**. A final judgment under Rule 58 will be entered concurrently with this Memorandum Opinion and Order.

JERRY H. RITTER
U.S. MAGISTRATE JUDGE
Presiding by Consent